NLRB Board Agents Use of a Three-Sided Cardboard Shield in Place of a Voting Your both. Yes, Your Honor. They can't see you. They can't see what you're voting on. Well, Your Honor, in this case, the evidence shows that they could see the upper torso of the employee. They could see the arms, the head, the shoulders, the movement of the employee's arms. That doesn't indicate how he's voting. Well, Your Honor, in a political election for a state or a government election, federal election, the ballot is full of choices. In an NLRB election, the ballot has two choices. On the left side is yes. On the right side is no. And, Your Honor, we would submit that if someone is staring at someone within a six-feet proximity and watching their body movement, which is totally exposed from the mid-torso up, including arms, that it is possible to discern whether someone's hand is moving to the right or the left of the ballot, even if you can't see the ballot. And there were eight employees who so testified. But you can't see the hand. So when you just did that, I looked, and I couldn't see in your upper arm, I couldn't see any movement. I could only see a movement in your hand. So unless I can see your hand, I don't know where you're moving. I mean, we're not talking about over here versus over here. They're next to each other. So if I saw your hand, I would know which side of the paper you're on maybe. But if I can't see your hand, your arm isn't moving wildly like this. Some people are left-handed. Some people are right-handed. No, this is true. And I think reasonable minds could differ as to how much a given voter, how much their body language would telegraph exactly how they were voting. But the blinds here are the people we have to give deference to. I mean, in other words, we aren't as an appellate court going to sit here and talk about slight gradations in your hand and what science people can use. I mean, that's a fact finding. Why would we find as a matter of law that when your arm is shielded, the upper torso nonetheless gives away so much that it invalidates an election? Because that's essentially what you're asking us to rule. Yes, Your Honor. If you look at the Board's decisions in Columbine, in Royal Lumber, the facts are not dissimilar from what we have here. In Columbine, the observers looked at the voters from their backs. They couldn't see the table. They couldn't see how they were actually marking the ballot, but they could see the movements of their arms from the back. So the Board said, that's not sufficiently secret. All of this, Your Honor, stemmed from the fact that the Board failed to follow its own regulations and use a voting booth, which its regulations require. And if you look at the Board's decision in Physicians and Surgeons, which is relied upon by the Council for the General Counsel, there's a description of what that voting booth looks like. It's referred to as the Board's standard metal booth, which is a standalone cubicle with curtains that shield the voters from head to lower torso. All you can see is their legs. What difference would it make to the voter if somebody could see their arms? Well, I think if someone could see their arms, Your Honor, a voter could be under the impression that someone could see how they're voting. And if you look at the facts, in all of the cases where a nonstandard Board voting booth was used, that's the rationale upon which the Board overturned those elections, the three cases that we cite. It might not convince them to vote for the union. It might further aggravate them with the union, and then they would vote against the union. So I don't see how you win either way. Well, Your Honor, whether a voter would vote one way or another is beyond the point. Certainly someone could be influenced. That is the point. Oh, my God, the union man was sitting six feet away. You're intimating that there would be intimidation or some sort of after effect, some threat. Yes, Your Honor. Well, I think, Your Honor, you have to look at what occurred in the voting room as the final confluence of the events that occurred before the voting room, with the significant events of vandalism, which we believe is a separate independent basis that this election should be set aside, with the threats of a hit list and employees losing their jobs when the union came in if they voted for the company. Was it a hit list or was it just a list? Well, it was referred to by several witnesses as a hit list. I believe the union took the position it was a – I'm sorry, Your Honor? Which witnesses, union witnesses or company witnesses? Company witnesses, Your Honor. I believe it was referred to by the union as a list that they were using to keep track of who they had visited and who they had not visited. But there's no question there's numerous witnesses testified that they were told and that the facility was told by employees who were supporting the union, by this in-plant committee, that when the union came in, if you didn't support the union, you were going to lose your job. And the Board has found that those threats are – We don't present anything, affidavits or anything, from anybody demonstrating or even strongly intimating actual misconduct. I mean, you make an argument that is really pretty speculative, all things considered. You say what could have happened, what somebody might have seen, et cetera, but is there anything, anybody who says, actually, you know, I looked over and somebody was staring at me and, you know, it was word of something. I mean, I don't see that you cited to physicians and surgeons as saying, well, it stands for the kind of voting booth you've got to have, but the case also dealt with the company making allegations of there being improprieties even in that case. And then they end up saying, the employer having failed to present evidence that voters' ballots, choices were seen by others, either inside or outside the confines of the voting booth, in this case, we adopt direct. So even spotting you, what you're saying about what the voting booth is supposed to be like, they still end up saying that in the absence of the employer showing some misconduct, you still don't win. So what's your strongest case for the scenario you have where you don't point to any actual misconduct, but just, you know, proximity, what might have happened, et cetera. What's the best one of these we ought to be honing in to say, okay, this is what you're arguing here? Two points. With respect to physicians and services, we argue it's wrongly decided, and the issues we're raising here, Your Honor, were never raised or argued or considered by the board or the court. That is, whether or not an actual voting booth is required by the board's regulations. I understand, but you raised physicians and surgeons to us and said, it stands for the kind of voting booth you've got to have, which is different than what you have in this case, right? I referenced it because it has a good quotation of a description of the standard voting booth the board has used. Yes, Your Honor. I understand. I just took you further in the same case. Understood, Your Honor. I know why you raised it. I just took you further in the same case to say it had a booth like what you want. But even in that case, they say the employee doesn't bring any proof. So I'm just saying what's the strongest case you have where there's no evidence, et cetera, or maybe there's this voting booth problem. I mean, it makes the point you make because otherwise, as you probably can see, you're just not seeing beyond the speculation of it what more is there. Your Honor, we believe that the board's decision of physicians and surgeons was designed to essentially apply a band-aid to what the real issue is, and that is the board's deviation from its use of a standard metal voting booth. And in Physicians and Services, the board held that when a standard board-issued voting booth, and it used those terms, voting booth, even though in Physicians it clearly wasn't a voting booth, is used, we will set a higher bar as to what you have to show to overturn an election. But for that erroneous standard involving a piece of cardboard that has three sides to it, the board would have been compelled to follow its precedent in Columbine Cable Company, Imperial Reed and Rattan, and Royal Lumber. So are you seeking from this panel not a determination as to whether or not misconduct occurred or not or whatever, but are you seeking from this panel a holding that thou shalt not have an election unless it is this kind of voting booth? Is that what you're looking for from us to say, ab initio, if the election isn't conducted with the, you know, exact one kind of voting booth in P&S, that we don't look, one need look no further as just per se fraught with issues? No. Is that part of it? No. I was not saying that, Your Honor. Okay. What I was saying was when you, the board can't bootstrap by calling a three-sided piece of cardboard a voting booth and then because it's a, quote, sanctioned board voting booth, ipso facto, unless you actually see how someone marked their ballot, it's improper. I think in this case also, Your Honor, the fact that the board agent didn't properly assemble the shield that was used also affected the results of the election in terms of the privacy. So if the court is willing to sanction a three-sided piece of cardboard and spot the board, that that could possibly be a voting booth, which we would disagree with. It wasn't properly used in this case, and we have submitted to the court in support of this oral argument several photographs that are actual exhibits from the record that show the differences and that show that the particular kit used, it's called a Pollmaster II voting kit, was not properly assembled. Why? Because it wasn't on the little metal stand? That's correct, Your Honor. What possible difference would that make? Well, two differences, Your Honor. If it had been on the metal stand, it would have been approximately six inches higher, which would have created some greater level of privacy in terms of where it was positioned opposite the observers in very close proximity. But more significantly, had it been on the metal stand, the board agent would have had lots of options in terms of where he could have placed that in the room. He could have easily placed that because it would not have been confined to a table that was in the room behind where the observers were sitting, so the observers couldn't look at someone as they were actually marking their ballot. Don't the observers have to observe? Well, the hearing officer made that argument. He said one person's staring could be another person's intently observing, and tried to— The observers don't have to look at them. They have to look at the voters. Well, Your Honor, we would submit that the only purpose an observer has with respect to policing the voting booth is to make sure there are not two people in there at the same time. In the board's standard metal issue voting booth, you can see their legs. You can easily see if there are two people. There's no board case law that has ever said that an observer is supposed to stare intently at the face of a voter while they actually mark their ballot. Okay, but so you told Chief Judge Stewart that you are not asking for some sort of absolute rule that failure to use this certain dimensioned voting booth invalidates the election. So if that's not an absolute rule, and we're just kind of looking at is there substantial evidence against what the board found, then I'm looking at Employers 8D, and it looks like this person's shielded all the way up to— it looks like a relatively tall gentleman that's standing there, and it's shielded all the way up to kind of where your tie is knotted just below that on that man, and his arms are shielded and the wall's behind him. And so to me, this looks more secure than when I vote. When I vote, everybody's walking by and all this kind of stuff, and you say there's a lot of elections, but I've been to runoffs where there is only one, you know, John versus Jane on the ballot, and frankly, people can walk by and whatever. And this looks more secure than that and certainly doesn't look like you could see how this guy is voting. So what is wrong with that? Your Honor, if you read the testimony, two of the witnesses who testified testified that they actually changed their body position and movement to try to conceal how they were voting because they were so concerned that the union observer would be able to see. One claimed he crouched over, and the other said he actually shifted his hand movement to try to throw off—that was his word—throw off the union observer. But is Employer's A.D. a fair representation of what it looked like at the time? It is a fair representation, Your Honor. Okay. How am I going to tell how this guy's— unless the two, you know, union or not, are, you know, five feet apart, I don't understand how a normal-looking ballot, which maybe you have to shift slightly to the left, slightly to the right, how am I going to know how this guy's voting? I don't see how—even if I was standing there, unless I was standing right next to him, how can I see how he's voting? Your Honor, I don't know that you can actually see how he's voting, but the standard the board set forth in Columbine, Royal Lumber, and Imperial Reed and Ratton wasn't that it actually had to be observed. It said employees, and I'm quote, could have led employees to believe they were being observed as they voted. It's a reasonable belief standard, and we had testimony from eight people that that's how they felt, the lack of privacy. Again, adding to that— Did they say they were intimidated and had to vote a certain way? I don't believe any witness testified how they voted, Your Honor, but I think given the vandalism and everything leading up to the election, there was certainly some intimidation. In fact, Your Honor, I would submit the fact that there were two void ballots in this election where employees selected both sides, put an X in both boxes, is extremely unusual in board elections. What does that mean to say nondeterminative? I'm sorry? There were four nondeterminative challenge ballots. Yes. No, there were also two void ballots, Your Honor, and if you actually add the two void ballots with the four nondeterminative, you get six, which is within— What does that mean, nondeterminative? Nondeterminative means that even if all the four had gone for the losing party, the union still would have won the election. Because it was a difference of six. Correct. Okay. 49 to 55. But if you add in the two void ballots, if those people hadn't been afraid, we would submit, and had not voided their ballots intentionally, that's certainly a reasonable inference the court can draw from the fact that there were two void ballots. Mr. Kaplan, come on. We got your argument. You're really pushing this to the limit, tying it in. Anyway, you're an able advocate that's working it. You're an able advocate. I'll just leave it at that. Thank you, Your Honor. I'll leave it at that. All right. Thank you. You've reserved some time for rebuttal. All right. Is it side or proceed?  Side? Okay. Good morning, Your Honor. David Seid from the Labor Board. In reasonably finding that the board used a sanctioned voting booth here, I would simply refer the court to the Physicians and Surgeons case, which is extensively cited in the board's decision and its brief, in which the board references a voting booth that was called a tabletop voting booth that resembles a lectern desk. In this type of tabletop booth, shields of voters lower arms and hands as they mark their ballots within the hollowed confines of the booth. And in Physicians and Surgeons, the observers and the board agent conducting the election were about four to five feet away, which is actually closer than they were in this election. Now, let me ask you this. I personally am not overwhelmed by the voting booth argument, but I'm a little bit more concerned. There seems to be kind of this atmosphere of intimidation. We've got people's tires getting slashed. We've got this guy standing there, you know, you know what to do and stuff like that. So there to me is kind of a bad feeling here, and that may not be enough to overturn it. I understand that. But can you explain a little bit about why the cumulative impact of all of these sort of questionable things that may be by themselves as a stray comment or this or that, but when you put them all together, particularly in light of the closeness of the election, create kind of a haze of dirt, if you will. Can you explain how we look at that and why the cumulative effect of all of this isn't a problem for you? Your Honor, the board is not aware of any case in this or any other court where an objection that in and of itself doesn't have merit, when taken in conjunction with other objections, suddenly becomes objectionable conduct. Well, it's not that it doesn't have merit, per se. It's just not enough. It's sort of like in a trial you let in one piece of hearsay, maybe it's not a big deal, but then you just keep letting in all this irrelevant stuff, and eventually it accumulates to be too much. That's the whole idea of cumulative error is that the one error, if the one error was enough, you wouldn't need cumulative error. It's here you kind of are saying, well, it's not enough. You know, this guy Martinez is there. He's making these veiled comments. That's not enough. Slashing the tires, that's not enough. Everybody's standing around the break room staring at everyone as they walk in. That's not enough. But what about when you put them all together? I don't think you can say that that doesn't matter. That's my question. When you put together maybe one isolated occurrence wouldn't be enough, but when you start adding it all together, you have an atmosphere of intimidation. Is that enough? And if not, why not? Your Honor, again, and I understand the court's concern, and I'm happy to discuss each of those objections individually, but the Board is simply not aware of any case where conduct that in and of itself becomes objectionable when somehow put together, therefore, becomes objectionable. And with respect to some of the individual objections, for example, some of the vandalism that occurred, the Board reasonably applied the third-party standard because there's simply no evidence to link it to the union. Most of the conduct that occurred was minor. The dissemination was very limited to the extent that it was disseminated. There was an employee here and an employee there that might have heard one piece, but there's really no evidence that employees as a whole even heard about all four of the incidents, and particularly for the one that might be considered the more serious incident, there's no evidence of dissemination except for one employee. And so when you start to look at them individually, that's why collectively, and again, the Board simply isn't aware of any case where the Board or any court has taken objections such as that and then put it together to somehow find an overall general atmosphere of fear and confusion. Was the car vandalism in the Conway parking lot? Your Honor, there were several of them were in the Conway parking lot. There were a few where it's not entirely clear where the employee was, where the employee found the vandalism. So, for example, the work truck that was damaged, that definitely occurred in the Conway parking lot. There were no cameras? Your Honor, there's no record evidence to indicate one way or another. I'll ask opposing counsel for rebuttal. What was the import of the problem, or why did he do this? There was an allegation that Martinez picked up the ballot box and shook it. What was that supposed to indicate? Your Honor, the concern in a situation like that would be if the ballot box was tampered with, and here there's simply no evidence that the ballot box was tampered with. There's no evidence that the ballot box left the sight of the observers or the board agent. It was evidently— Why shake it? What does that mean? Your Honor, I can't specifically speak for what Mr. Martinez was thinking when he did it. Whether to see how heavy it felt like or how light it was with the various ballots in there, I can't answer that. Is that a normal thing to do in LRP elections, to shake the ballot box? Your Honor, I'm not aware that that would be a typical procedure, but there was no voter in the room when that occurred, and, again, nobody lost sight of it. But, again, to me—and it may not rise to the level of anything that helps your opponent, but it just—it seems like there's a lot of this stuff going on. It's very disturbing to me as far as Martinez sitting there, you know what you have to do, and he's supposed to be the observer, and he's saying stuff like that. I don't find that particularly proper. Your argument is it's not improper enough, and then that's when I get into the accumulation. If we take that as an isolated piece, and then we have this isolated piece, and then we have this isolated piece, but it can become less isolated when we have a bunch of them. Your Honor, with respect to Mr. Martinez's conduct as the union observer, on its face, the various comments that were made were ambiguous as far as you know what you need to do. You know what you have to do? How am I supposed to construe that as anything other than—from a union observer, anything other than I better vote for the union? Your Honor, there is no statement being made, one way or another, how somebody should vote. And then, as the Board explained in context here, initially when some employees first came in to vote, and that was before some additional chairs were set up, there was a little bit of confusion over voters needing to go to the observer table. So it could have been a reference to that. It also thereafter could have been a reference to the fact that the employer had apparently given some training to the employees over how to vote and what to do. It could have been a general comment toward that. Again, it would be some speculation as to exactly what it was referring to, but there is no evidence here that he ever told somebody how to vote or how they should vote. And, in fact, although he did— See, I wouldn't want that by—if we were to affirm this, I wouldn't want that to be seen as like this is how an election should be run, that you have some observer standing there making comments like that. I mean, I find that very improper. Maybe it's not improper enough under the standard review and blah, blah, blah, but I'm concerned that if we were to affirm this, then we continue to have this kind of conduct. Your Honor, I understand the Court's concern. Elections are handled and run by people. It's not run by machines. And the Board has existed for almost 70—I guess it's 70-plus years now. And for 70-plus years, the Board has had to address and deal with cases where conduct occurs during an election where the Board has to determine whether it's sufficient to overturn the election. It doesn't mean that the Board condones some of the activity that might have gone on by Ms. Martinez or that it's ideal for someone to pick up the ballot box, but at the end of the day, the fundamental question is, was this something that prevented a fair election from taking place, that when people went into that ballot booth and cast their ballots, was there conduct that occurred that would have prevented them from exercising their free and fair choice? Well, I somewhat doubt that the company is just laying back waiting to find out the returns. I mean, these things are pretty contentious on both sides. Typically, there's a lot of passion and all that, and even if all the conduct doesn't meet the Sunday school requirements, I'm not making light of the other stuff, but in this case and other cases, there's typically some tit-for-tat by the company, et cetera, and all of that. But you boil it down, that's why you have a hearing. Somebody's got to put the evidence on, and somebody's got to make a determination. The question asked of counsel opposite, same question here. Beyond those, is there any evidence that was submitted at all of actual misconduct vis-à-vis casting of the ballots and so forth? Your Honor, the board is not aware of any evidence or claim that anyone was in line to vote where any of this conduct occurred or witnessed any, particularly, again, with picking up the ballot box, that anyone observed that conduct outside of the company observer and the board agent. Any evidence of someone, let's say, who planned to vote, but either these rumors of somebody glaring at them, staring at them, or Martinez or something, and anybody giving affidavit, well, I was going to vote, but I was afraid or intimidated. I mean, anything that suggests someone, not somebody who actually voted and which way they voted, but someone maybe whose voting was chilled, shall we say, by the atmosphere, so they didn't vote at all. Any evidence of that? Your Honor, the board is not aware of any evidence. I would note, in fairness, that the board standard is objective. It doesn't look to subjective reactions, but having said that, there is no specific evidence of any type of atmosphere being created that prevented or precluded somebody from voting that might have planned to vote. Certainly, the board is interested in it being a fair election where people feel free to cast their ballots in ways. I hear what you're saying about objective, but it can't be that they turn a blind eye to things that might chill somebody from actually casting a vote one way or another. Well, that's correct, Your Honor. And, again, that's what the board objectively looks at the type of, when there's objectionable conduct alleged, looks at the conduct and looks at what transpired and the manner and mechanism of what's being alleged and then objectively determines whether or not to overrule the objection. So refresh my memory. What was the time frame of the election from when to when? Your Honor, the election was held in two sessions. There was, I believe, it was a three-hour session in the morning and then a three-hour session later in the afternoon. So is that, what, does that comport to, like, shifts, or that's just typically the way it is, or what? No, Your Honor. The timing of an election really can vary from election to an election. Sometimes there can be only one session. There could be multiple sessions. In this particular situation, I'm not sure that it particularly comported to particular shifts. I think that the shifts were a little bit rotating in how people came into work, and so it was designed to, as elections usually are, to encompass and permit as many people to vote as possible to cover the time, and that's something that gets worked out between the board, the union, and the company to determine what would be the best times and agree. And this was, I believe, a stipulated election agreement where the parties agree on the times and the location of the election. Unless this court has any other questions, the board would ask that the court enforce the board's order directing the company to bargain with the union. All right. Thank you, Your Honor. Captain, do you have a bow? To please the Court, starting with Judge Haynes's comment regarding aggregation, we believe that aggregation was required. There's Fifth Circuit case law, NLRB v. Carlton, McClendon Furniture Company, and NLRB v. Carroll Contracting and Ready Mix cited in our brief that stand for the proposition that single acts and independent acts can indeed and should be aggregated in terms of their overall impact on voter and on whether or not there's election misconduct. And we believe the hearing officers, one of us ---- How do you get past the standard review on that? So if we were going to disagree with you on everything except we were questioning aggregation, so that was our focus, if that were the case, what would be your argument specific to that on overcoming the fact that we give deference and have a deferential standard of review? Well, actually, Your Honor, in the case of the Board's conclusions of law, the standard is de novo. It's not deferential. No, I know, but it's deferential to the determination of whether this is really something that would have caused a problem with the election. Well, I think under universal camera, the Court can certainly look. It's the standard review. It was the Board's decision based on substantial evidence on the record as a whole. And I think the Court's able to do that, Your Honor. Okay. And what is it that, you know, they're construing the same stuff, even aggregated, as kind of being isolated, sporadic, you know, maybe not picture perfect, but life is life. And as Chief Judge Stewart said, you know, people are passionate and vote for John, vote for Jane kind of attitude and this and that. What is it here that would overcome the deference to substantial evidence supported a finding that the aggregation wasn't sufficient to overturn the election? So, Your Honor, let's look at just the vandalism piece. It wasn't isolated and it wasn't sporadic and it wasn't over a long period of time. In fact, the hearing officer's findings with respect to the vandalism are remarkable. He agreed and found that the damage was tied to the election and that employees could reasonably reach that conclusion. It occurred over a short time frame just before the election. Those were the hearing officer's findings. He also specifically pointed out the damage to the brake system on one of the driver's work trucks and the fact that that could have resulted in injury or death. And then he goes on to say, remarkably, I find them not to be extreme in nature. The record shows, with respect to vandalism, 24 employees were either the victims of vandalism themselves, 10, or heard about the vandalism. That's more than one-fifth of the voting unit. And do we know how those people voted? Nobody knows how anyone voted, Your Honor. So under... So would you agree, though, that the standard is whether you have produced evidence sufficient to make a prima facie showing that the atmosphere of free choice was destroyed by the conduct? Or what is the standard we apply to the aggregation-accumulation argument? I believe... You said we have a De Novo review, but then you said a substantial evidence. I'm just trying to get at what argument are you making legally that we can overturn essentially fact findings about how this impacted the election? That's the fact finding that concerns me. I think whether or not the individual events in the aggregate considered cumulatively, which the case law does require, was sufficient to destroy the laboratory conditions that affect the outcome of the election. We don't have to say that to a certainty, and I don't think the board case law requires it to a certainty. All that's a case you make below. I mean, our job isn't to superintend these elections. You know that. I get your point, but our job... I mean, we do it in other cases that we get coming up. We may look at it some and have a view, but that's not what the cases you're citing say. We don't superintend the elections and so on and so forth and all that. Able case you may make of it. Surely you're not asking us to do that, are you? No, but there is an oversight function that the court does serve where the board doesn't get it right, Your Honor. We believe the board here didn't get it right, and the hearing officer's 82-page decision is replete with factual inaccuracies that are evident from the record as a whole. The hearing officer did not make credibility determinations based on witness demeanor. He specifically said it on page 13. Absent from all that, you've got to pick here, pick here, pick there. Martinez held the buck, but you concede there was no tampering. He never lost sight of it for a few seconds. I mean, all that's kind of conceded. So for every point you make, it seems to be tempered by something. He had it for a few seconds, no allegations of tampering. That was conceded below and in the brief.  But it's not to a degree that this wasn't sort of urged below, teed up, et cetera, et cetera, but still comes out differently. And I'm still not sure personally if you ever really differentiated the standard in terms of overcoming the burden. Chief Judge Stewart, if I may answer that question. Sure. With respect to tampering, I don't believe tampering is required, but there was one witness who voted who testified. His name is Carlos Gutierrez, and it's quoted in our brief at page 13, that he was certain the board agent saw how he voted. And if you look at the photographs we submitted, the positioning of the board agent in proximity to the voting shield was within two or three feet, Your Honor. That was his impression. Whether he was right or wrong, we don't know, Your Honor. But that's not acceptable, Your Honor. The board has referred to its elections as the crown jewel of the agency, and rightly so. And we don't believe that these types of voting shields, this is not an isolated case, Your Honor. There's a case pending in the Third Circuit. This is happening all over the country because these new voting kits are lighter and they're a little easier to maneuver than the aluminum voting booths. And so there's a reticence on some board agents to not use them, Your Honor. I had an election last month in New Jersey. I had to specifically call the board agent and say, please bring a booth. I don't want one of those shields. And she acceded to my request. That shouldn't be the standard, Your Honor. Thank you. Were there cameras in the parking lot? There were not, Your Honor. There were not cameras in either the employee parking lot, where all the vandalism occurred, Your Honor. It was not off property. Or where the truck was parked before his pre-check, where we believe the grommets on the air hoses were uncoupled. You referred to ten employees having damage. I thought the brief said four. There were four who testified, Your Honor. But there were a total of – the testimony was a total of ten. And, Your Honor, I tried to get the other six to testify. One can only do what one can do. There was a lot of fear and intimidation, Your Honor. I tried to get the other six to testify. I couldn't get them to testify. Okay. Thank you. Thank you. Definitely not the crown jewel of how to do it. I couldn't agree on that. Thank you, Your Honor. Well, ABLE counsel fashions the arguments in a way that we can definitely get our arms around what you're putting forth. Thank you to both sides for the briefing and argument. The case will be submitted. Before we take on the third case, the panel will stand in a real brief recess. Thank you.